Thank you very much and welcome Mr. Furlong and Mr. Zosmer. We're calling our first case United States of America versus Richard Winn. Mr. Furlong, do you want to reserve any time? I anticipate I'll use most of my time, but in case I don't, would it be possible to, if I have a minute or two left, to say something if I choose to? Or do I have to specifically give you the time now? Well, you're supposed to tell us now if you want to reserve time. Well, I'll pass on reserving time. Okay. Please proceed. If the court please. My name is Christopher Furlong, and I represent the appellant in this matter, Richard Winn. I want to concentrate today on the issue that is raised in Mr. Winn's brief relative to the sufficiency of the evidence, specifically as it relates to the convictions of the firearms in question, the Taurus and the Smith and Wesson, which were under counts two and four. In these type of constructive possession cases, the law seems to run the gambit as to what is factually required. And I guess that makes sense because each case is fact driven. So let's, let's do, let's get into the facts. And I'm going to tell you what my understanding of the factual background is. You correct me if I'm wrong. They find Mr. Winn in the house, in or near the dining room. The guns are in a box in a cabinet that's closed. There are drugs everywhere. But in the box, there's, there is, there are drugs that are packaged like the drugs that are found elsewhere in the house and with which he's charged and he's convicted of possessing and conspiring, possess those things. And he doesn't contest those, the drug convictions, as I understand. So, and he's got a key that he actually points out to the police officer, say, get my keys and the keys include a key to the house. So help me understand if the, if the drug, if the drugs that are, he's acknowledging he's, he's not appealing his conviction on that. Those same kinds of packaged drugs are in there with the guns. And he's got a key to the house. What's your best argument for why that doesn't constitute a sufficient connection to him to support the conviction on the firearms counts. Well, my understanding is that the drugs in the cabinet were basically just materials and I didn't think they were actually in the box with the weapons themselves. I thought they were sort of strewn throughout the floor of the cabinet. That was my understanding. I'm not trial counsel, but that was my belief. And you have accurately set forth the basic arguments as far as a drug conviction goes. And I think the drug conviction, as far as what a jury might consider appears to have at least met the criteria for that. And that's why we're not appealing it in light of the phone call and the text messages that were admitted into evidence as well. But I say the guns are something totally different. And the reason I say that is because they were not out in plain view, although he had a key and I appreciate the reference to a key as opposed to the appellee who keeps saying the key, it just seems to be a key that was found. Mr Furlong opened the door, is that correct? I believe it did. Is there a distinction to be made from our perspective or your perspective between the 922 G and the 924 C counts? As far as the substances? Aspects of it? As far as the sufficiency with respect to the guns. They're two different gun counts, right? They are two different gun counts. The only thing that I can say that makes the playing field a little different is the fact that in count two, he is charged with possession, but also aiding and abetting. And count four, he's not charged with aiding and abetting, he's charged with straight possession. And based on the evidence that was presented, when the police came to the residence, they were looking for shooter. They were looking for a gun. They knew that there were some drugs there and they entered the house. Once they crossed the threshold of the house, that's the first time that Richard Wynn even comes up on the radar screen as it concerns this particular matter. And sort of my thought is that the guns are totally different because they're not out in plain view like everything else. Of course, unfortunately, they're fingerprinted. They're never tested for DNA, nor was the cabin. And I think the response at trial was, well, we had two guys in the house. What was the need for that? But the interesting thing is that Green is in the house, the one that is affiliated with the search warrant, and he's up in the one room in the house that has any semblance of being a room that could be used for something more than just packaging and whatever. You had furnishings in there, you had clothes in there. Well, the fact that Green has got more obviously culpable things going on, that doesn't mean that your client is less culpable. I don't think anybody's going to disagree that Green has a lot of stuff tying him to the place. Is it possible for two people to constructively possess something at the same time? I would probably think so. I think there have been convictions, I believe, that are out there that show two people in a living room can constructively possess a firearm that is sitting right in front of them. Okay. So let's just leave Mr. Green out of it pretty much. I mean, the question that I'm focusing on is, what's the evidence against your client? What are the things tying your client to those guns? Actually, even before dealing with the guns, can we agree that your Rahafe argument is foreclosed by Greer, that you just don't have legs on that? They're very tiny if I do, and Greer did not help me one iota. I understand that because we did not meet the criteria of arguing. We might have taken a different tact had we known what had happened. So I think that's a problem, but I wanted to keep that argument viable for him. And I know I'm probably dead wrong on this. I think Rahafe also sort of says that not only does he, he has to know that he is part of a precluded class, not the fact that he's just a felon and the law says you're a felon in possession. That's what I think it says, but I'm not sure I have many supporters for that aspect. Yeah, I don't think so either. It's not that I'm unsympathetic, but it lost. That's one of the reasons I'm not really addressing that today. Yeah, okay. So we're really focusing on these gun counts and the possession and the innate of drug trafficking piece of this. So help us also understand what we should make of the recorded conversation from the jail where he seems to acknowledge that he knew guns were there. What's the right way for us to look at that? Does that indicate he knew those drugs were there? I mean, those guns were there. Well, the question, and candidly, Your Honor, I don't know that it was fully explored at trial, but I know it was referenced. Here you have an arrest on, what, September the 15th at 6 o'clock, 6.30 in the morning. He has this phone call, the one that we have, I think it's T1, on the 18th at some time, I think in the morning as well with a person unknown. And you're right, in that conversation, he says specifically, so you don't even know, you don't even know, oh, no, sorry. He says, oh, he says, huh, I don't even know what they really said they put on us. Yeah, I'm saying, I know they ain't put the guns. I know, I know it's all narcotics. You know what I'm saying? He's dead wrong there. Well, he's wrong about what they're going to charge him with. The question is, does it show he knew the guns were there? He wasn't a guy who was just surprised when they opened the box up. I mean, is that an inference we have to take? It's something the government successfully argued, but the problem is, Your Honor, he already been charged because two sentences later, he says, my preliminary hearing is scheduled for October the 2nd. He wouldn't have known that had he not been arraigned. And when he was arraigned, he was charged with the guns. And defense counsel tried to elicit that during trial, unfortunately, through the case agent, Agent Becker, and he didn't get very far. And then I don't know what happened. I don't believe he then was able to successfully put in the record the charges from the Commonwealth of Pennsylvania. So if I understand, if I understand you correctly, Mr. Furlong, you're arguing that at that point, he knew there were guns because he had been charged. That's how we should interpret that conversation. Yes. Yes. Because he clearly knows when his preliminary hearing is. This is three days later. Then how do you explain to him saying they're not going to put the guns on me? They have put the guns on him, so to speak. Well, maybe because he didn't think he was liable for them because he didn't know anything about them. But it's certainly, you know, we all say stupid things in our lives. And that's saying that Mr. Green, you know, I know Mr. Green was charged with the guns, but that Mr. Wynn articulated the actual charges against him because he was dead wrong. He had been charged with. That's that's the problem. Okay. I think that the questions that I've been. And cited. Relate to automobiles. And what can be perceived. By a person in an automobile and the constructive possession of an item in an automobile. And I think an automobile is significantly different from a residence. Because a residence has a far greater expanse. A car has a limited area. What concerns me is that I suppose under the theory that if you have a key. And the guns weren't found in a cabinet, but they were found in an attic. Or they were found down by leaky pipes in the basement. That because you have a key that automatically makes you responsible for the guns. Now, in a car, if it's under the driver's seat, I could understand that. But in a house and you have a key. When somebody else who is affiliated with the house, who is affiliated with the house pursuant to a gun and is in the house at the time, I think is significantly different. And that's how I think. Let me explore that a little bit with this additional context. It doesn't appear that this was a real residence. It wasn't a domicile. It was just a stash house. True. And so does that fact make a difference when someone has a key to that kind of house? Is he reasonably charged with knowledge and control over the stuff that's in that house? I could understand the thought process saying that because of the nature of the house. But because the nature of the house and other people also have access to it, because Green was there. I don't know that I have total control every minute, 24 hours, seven of what comes in in that house. And what is that gun? The Smith and Wesson had been on the street a couple of days before this and then was returned to the house. That's why they were there. So I don't know that when necessarily, and he certainly wasn't affiliated with that weapon as a shooter was, would have known that the weapon itself had been returned. I would say the case would be stronger against him if they were like, almost like in Jenkins, where the guns were sitting out on a table and he's walking right by him. That's a strong reference that he could control. But again, the evidence has to be that he has formed the intent to control the item in question. And I just don't see it here. I mean, it's not in plain view and there's no corroborating evidence that he physically possessed or intended to possess the weapons. So that's sort of my thought for that. But I do understand the thought process because it's a stash house. It's not like, I guess, Ms. Baltimore and Brown, who it's her house, drugs are all over it. But yet, because there's nothing in her bedroom, how do we tie her to it? Well, it's her house. But that wasn't strong enough. At least she said it was her house. So there is the difference. I see what the court is trying to articulate there. Anything else, Judge Restrepo or Judge Porter? No. Okay. Thanks very much, Mr. Furlong. Mr. Zosmer, we'll hear from you now, sir. Thank you. Good morning, Your Honor. May it please the court, Robert Zosmer on behalf of the government. The facts here are really quite overwhelming and I will discuss them. But the first thing I want to emphasize, of course, is the standard of review, which is that it's taking all the evidence in the light most favorable to the verdict here for the government. And also looking at it deferentially to see whether any rational juror could find guilt. And what it means is that… Find guilt beyond a reasonable doubt. Beyond a reasonable doubt. So you help me understand how guns in a box in a closed cabinet out of view when there's nothing to tie the guy to the guns. No fingerprints. Not visibility from where he stands. Nothing to tie him to it, it appears, except for he's got a key to the house. And they don't even know how often he's been there. They don't… There's no testimony showing that he's there on a regular basis. There's no testimony showing that he was carrying a gun at any point when he was around that house. Just… You're like… Where do you get to beyond a reasonable doubt and get past Brown, which says guns and drugs go together, but that doesn't mean one is proof of the other? How do you get to beyond a reasonable doubt, Mr. Zosmer? As I said, Your Honor, I believe the facts here are rather overwhelming. It will take me a couple minutes, but let me lay it all out. First and foremost, as Judge Porter mentioned, this is a stash house. This is not a residence. And in fact, in our brief, we were a little generous in saying that Mr. Green resided there. When I examined the record more closely and read the testimony again last night, the officers were very clear. Yes, Green was in that bedroom probably the night before, but they said people are not living here on a long-term basis. There's a handful of clothes. There's no other indicia that anyone lives there. What difference does that make in terms of whether he had… He's not contesting the drug conviction. He's thrown in the towel on that, okay? The drugs are on me. How does the fact that it's a stash house mean everything that's in that house is connected to him? It means, Your Honor, that a rational jury can infer that someone where there's a stash house that only exists for the purpose of bagging and selling drugs. And this individual is the only one who has the key to the house. He is there at 630 in the morning where he does not reside. This phone is on the table. It's what the officers describe as a burner phone. It's only been in service for a month. It's a flip phone that can easily be discarded. It's of no value. It has messages on the phone both to win and to Green. In other words, this is the phone that they mutually use in their drug business. The officers come in and one officer explained the process of bagging crack was happening at that moment. They know that because there was loose crack in a razor on the table. The officer explained that if it were not happening then, that crack would have been packaged along with the more bulk quantities that were elsewhere in the house. That's all this place exists for. And he's the only one with the key. And I'll cite to this. Why do you say the key? It's a key. Does anybody have any idea how many keys there are to this place? We don't. We know that the only key to the front door in that property at that time is on a key ring with his name on it. You know that the only key that they found and know of is that key. You don't know. You can't possibly say that the only key in that house is the key there. You can say the only one they found is his key and he acknowledges it's his. Well, I agree, Your Honor. And again, I'm going to come back to the facts because I still haven't gone through all the facts that are pertinent here. But I have to keep coming back to the standard of review. We could have a debate all morning long and I will recognize fully that there are arguments on both sides. I can say that's the only key we found. Someone else could say, well, there could have been five keys you didn't find. What Caraballo Rodriguez teaches is that when there are competing inferences, even if they're equally reasonable, this court will accept the inference that favors the verdict. No question about that. You don't have to persuade me and I don't think you have to persuade my colleagues what the standard of review is and what it means. The question is, is there a basis on which a rational juror could say those guns are his? He's constructively possessing those guns when all the things you're talking about are drug related. And so what one has to do is say, well, the guns are in the house. He must have known because he was involved with the drugs. That's your connection, right? Correct. If we're not prepared to say guns and drugs always go together, therefore, then you've got nothing else, do you? I don't agree, Your Honor. Well, first of all, this court has said over and over that drugs and guns go together. And we've also said in Brown, in explicit words, but the proof of one is not enough to establish constructive possession of the other. It's not enough. You've got to have something more. That's the language of Brown. Are you pushing against that? No. And if I may, Your Honor, Brown, I will get to Brown. It's also the language of Cunningham, right? Well, Cunningham is really essentially overruled by Caraballo Rodriguez. Cunningham, I would suggest, is not good law. But with regard to Brown, Brown has been distinguished repeatedly for 30 years, and I will distinguish it again in a moment. But let me talk about the guns here in relation to the drugs. There are drugs throughout this house. Marijuana, heroin, and cocaine. There's packaging material, there's paraphernalia, there's bagging material, and there are drugs. Each of those items is also in the box with the guns in the cabinet. And when we talk about dining room table and cabinet here, maybe we're thinking of a nice room. I don't know if Your Honors have seen the pictures here. We're happy to supply them. This place, and I don't mean this to offend anyone, but this place is a dump. I mean, someone said it looked like it was undergoing rehabilitation. So it's a dump. The guns are in a box, in a closed cabinet, in the room. Nobody's suggesting that they were visible. Nobody, are they? No, Your Honor, but if I may, the box in the cabinet is about three feet away from the table where it's clear that people had recently been sitting, packaging crack. It is instantly accessible. And also, let me emphasize, in the box, there's marijuana in the box. Mr. Furlong expressed no recollection about that. But there's marijuana in the box, and every type of packaging for the marijuana, heroin, and cocaine that is elsewhere in the house is also in the box, stuffed in. The one gun, the gun that is fully assembled, is wedged in a way that it can instantly be grabbed. The handle is facing up. The other gun is in a box, disassembled. But the one gun that's in the Taurus, that's charging count two, is instantly accessible. Help me understand, why is that, how is that relevant to his knowledge and what we should believe a rational juror could understand about his knowledge? What is the positioning of the gun inside the box, inside the closed cabinet, mean for whether he knows the gun is there or not? Because a rational juror can conclude that when someone's sitting at a table in a stash house, packaging drugs at 630 in the morning, in a place he has the key to where he doesn't live, and there's an instantly accessible gun right behind the door of a cabinet so nobody else could see it, I would say not just a rational juror, but just about any juror would conclude that that gun is there to protect the drugs. Also recall that the officer testified that the total quantity of drugs in this house, marijuana, heroin, and cocaine, were worth about $30,000. And the expert testified that drug dealers who have that kind of stash usually have guns in order to protect it. Every fact in this case points to the fact that that gun is there to protect the stash house, and that it is close by, hidden so that nobody else who walks in can just see it and grab it. So what we're coming down to is the key, right? He's got a key, and there's a burner phone on the table with a message to him. Because otherwise, nobody testified when he went in, when he went out. For all we know, he was there five minutes before. Respectfully, I will not agree, Your Honor, that quote, all we have is the key. We have everything that I've just described, which collectively depicts a drug trafficker who has a gun accessible, who is packaging and selling drugs, who's taking orders on the phone, who later in the phone call in the jail recognizes that there were guns in the house. The jail call is another great example. Well, yeah, talk to us about that and speak specifically to what Mr. Furlong said, which is he knew it because it came after his arraignment. Absolutely. Another great example of the application of Caraballo-Rodriguez. The exact quote in the phone call is, I know they ain't put the guns. Now, our interpretation of that, that the jury can accept and that this court must accept under the standard of review, is that he knew there were guns in the house three days before this call, and he's saying the fact that they haven't charged me with that. Now, Mr. Furlong has a different take, but that can't be accepted at this time, and his take, in addition, is not supported by the record. He says that Wynn was charged in state court with the guns and had had his arraignment, and therefore this statement doesn't make any sense, but that never came in the record. They tried to introduce that through the FBI agent, who essentially said, I'm not familiar with it, I don't know what you're talking about. And the defense never came back and showed that he was charged with the guns in state court. That's not in the record to this day. But again, the interpretation, I know they ain't put the guns, I know it's all narcotics. An obviously reasonable interpretation of that is that he knew there were guns in the house and he hasn't been charged with them yet, was his thought at that time. What does it, does the fact that he knows by that point that there were guns in the house, I mean, he's in the same prison with Green, he's presumably not in, there's no indication he's in solitary isolation. I mean, how, why is it, why is the inference, why is the logical inference, if you know something in, on the date you say something about it, that you knew it at the time of the crime? Because it's a reasonable inference, and we can fashion alternate explanations all day long that Green just told him about it the day before. If you ask me if that's reasonable, sure, I'll agree that just about anything's reasonable, because at this point, on appellate review, we have to accept the reasonable inference that favors the verdict. Okay, well you said you were going to get to Brown, and you ought to do it, so get to Brown. Yes, sir. So in Brown, as has been distinguished repeatedly, I've probably spent most of my career distinguishing Brown, and I've never seen it applied to reverse a verdict. Brown is a case in which a woman has a key to the house, and she lives there. And she lives in one bedroom, where no evidence is found of any drug trafficking. Her name is actually Baltimore. We know Brown is the drug trafficker. He's the guy who controls the drugs in the rest of the house. He's convicted. His conviction is affirmed by this court. But Ms. Baltimore's conviction is reversed, because there's no evidence at all linking her to anything in the house, other than that one room in which there's no drugs at all. That can't remotely apply to a stash house. How can you say it can't remotely apply? It's her house. She's walking in and out of the place. There are drugs all over the place. And the court's comment is, you don't get to just say, oh, guns and drugs go together. You don't get to just say that. You've got to do something to link the person to the gun if you're going to say, beyond a reasonable doubt, you had constructive possession, and now you're going to do the time for a gun crime. Well, it's more than just the association of drugs and guns. She is essentially acquitted of everything, including the drugs, because she has no connection to any of the illegal activity. Here you have someone who is convicted of the drugs that are throughout the house and in the box with the guns, and is not challenging that conviction on appeal. So here we have a situation in which the person, beyond a reasonable doubt, is responsible for the drugs in that house. And then you add to that this court's conclusion. It would be a stunning reversal of decades of precedent to say that when someone has this connection and this control over all the drugs, including the drugs in the box, that he is not also in possession of the gun that an expert says is there to protect the drugs. This is not remotely comparable to Brown. What is more comparable to, and in fact far stronger than, is the Jackson versus Bird case that we cite in our brief. Jackson versus Bird is a case in which drugs are found in a cooler that's inside of the house. There's no direct evidence linking the woman, the defendant, to that cooler, but she is the lessee on the apartment. And this court says that as the lessee, she's responsible, and a jury can find her responsible, for everything in the residence. Here again, the evidence is far more extensive than what's in Jackson versus Bird, where you have, again, the only key to the house, 630 a.m., there are the packaged drugs, the admission on the phone call, etc. All the additional things that are said here. This is just an exceptionally strong case on which the jury could rely. What about 924C and Garth, and the use of the gun, the carrying the gun? Let's assume everything you're saying is accurate, and there's no reason to doubt that, but is that enough for a 924C conviction, consistent with our opinion in Garth? Yes, this court has laid out the factors that a jury, a court can look at for 924C, the type of gun, the type of activity, where it's located. Every piece of evidence here checks off that box. Garth is a different case. Garth is a case where there's a different person walking through the train station holding a bag that has the gun in it. There's no evidence that anybody's ever talked about a gun, or had any kind of ongoing relationship. Again, here you're dealing with a stash house, where the gun is there to protect the stash. That's enough for uses or carries? I'd have to look at exactly what the charge was here, and certainly enough, it could also be possession and furtherance, which is the other alternative under 924C. But yes, I would say it's also sufficient for use and carry, because that's what it's there for. That's its function, is to protect the drugs. Again, can a rational jury find beyond a reasonable doubt that this gun is there to protect the drugs in the same box, in the same house, where nobody permanently lives, where there's this there to traffic? I find this to be a very compelling case, and that's what… So should he have… was his trial strategy flawed in that he should have said, I knew about the drugs on the table and in the house, but I didn't have any idea about those drugs in that box? That's a set of drugs I'm not… I mean, is that it? It's the drugs in the box that do it? I was actually… I had that thought yesterday again when I read the trial transcript, and I was actually impressed by how defense counsel handled it, Mr. Shapiro. What defense counsel… obviously, he's trying to get his client off on all of the charges, but he did emphasize the guns. Obviously, I would have marched right in here and said, oh, he's making an argument to you now that he didn't make in the district court, but he actually made this argument. There's a moment in the trial and during the argument where he says that proximity alone is not enough for the drugs, and especially for the guns. And so he was carefully suggesting to the jury, look, I want an acquittal. I don't want to be responsible for anything, but take a particular look at these guns. And so I think it was a very reasonable strategy, and not just to take a conviction on these very serious drug counts, which really would have led to a similar sentence probably. But no, he did emphasize the guns in particular, but the government responded in the manner that I have to show how compelling it is. And then as good a job as Ms. Shapiro did, my former colleague, Ms. Winter, who tried the case, did an outstanding job in teasing out through witness after witness all the… We got you. Judge Restrepo or Judge Porter, anything further? No. Okay. Thanks, Mr. Zosmer. Thank you, Mr. Furlong. Appreciate the counsel's argument. We've got the matter under advisement.